UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE ANTHONY JOHNSON,

               Plaintiff,

v.

HATATU ELUM,
MICHELLE PARSONS,
JEREMY HOWARD, and
TIFFANI KISOR,

               Defendants.

_____/

Case No. 4:20-cv-12422
District Judge Matthew F. Leitman
Magistrate Judge Anthony P. Patti

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 8, 12, 19)

**I.**    **RECOMMENDATION:**  The Court should **GRANT** Defendants' motions for summary judgment.  (ECF Nos. 8, 12, 19.)  If the Court agrees that Plaintiff's claims against these Defendants (ECF No. 1) are either not properly exhausted or fail to state a claim upon which relief may be granted, then this matter is concluded.

**II.**    **REPORT:**

    **A.**    **Background**

    Dwayne Anthony Johnson is currently incarcerated at the Michigan Department of Corrections (MDOC) G. Robert Cotton Correctional Facility (JCF). *See* www.michigan.gov/corrections, "Offender Search."  On August 18, 2020,

while incarcerated at JCF, Johnson filed the instant lawsuit against four

Defendants:  (1) Hatatu Elum, who is identified as a JCF Librarian; (2) Michelle

Parsons, who is identified as a JCF Assistant Residential Unit Supervisor (ARUS);

(3) Jeremy Howard, a JCF Deputy Warden (DW); and, (4) T. (Tiffani) Kisor, a

JCF Assistant Deputy Warden (ADW).  (ECF No. 1, PageID.1-2, 24; *see also* ECF

No. 10.)

The facts underlying Plaintiff's lawsuit concern his alleged October 30, 2019

transfer from JCF to the MDOC's Chippewa Correctional Facility (URF) – located

in Michigan's Upper Peninsula – in retaliation for Plaintiff's allegedly protected

conduct.  (ECF No. 1, PageID.7-14 ¶¶ 1-35.)  He seeks compensatory and punitive

damages.  (*Id*., PageID.5-6.)[1]

## B.    Pending Matters

Judge Leitman has referred this case to me for pretrial matters.  (ECF No. 9.)

Currently before the Court are Defendants' pending motions for summary

judgment.  (ECF Nos. 8, 12, 19.)  In sum, Defendants argue that Plaintiff has failed

to "exhaust administrative remedies on his claims," "plead how MDOC

Defendants were each personally involved in any unconstitutional conduct," and

---

[1] Plaintiff also seeks the appointment of counsel (*id*.); however, any such motion
should be filed separately, keeping in mind the appropriate authority.  *See*, *e.g.*, 28
U.S.C. § 1915(e)(1); *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993).

"state § 1983 claims against MDOC Defendants in their official capacities." (ECF No. 12, PageID.155-156; ECF No. 19, PageID.206-207; ECF No. 8, PageID.81-94.)

Plaintiff has filed responses (ECF Nos. 14, 16, 23, 25), and Defendants have filed replies (ECF Nos. 22, 24).[2]

### C. Discussion

#### 1. Transfer from JCF to URF

Seemingly in September 2019, fellow inmate Floyd Chambers sought Plaintiff's assistance with a criminal application for leave to appeal, which was due on October 8, 2019. (ECF No. 1, ¶¶ 2-3.) Plaintiff agreed to help and completed retyping Prisoner Chambers' application on October 1, 2019. (*Id*., ¶¶ 4-5.)[3] At

---

[2] In his February 10, 2021 response, Plaintiff argues that "Defendant [ADW] Kisor's motion for summary judgment should be denied for failure to file an appearance or respond to the summons and complaint within the 21[-]day time period allowed by court rule." (ECF No. 16, PageID.192 ¶ 4.) While it is true that a defendant "must serve an answer . . . within 21 days after being served with the summons and complaint[,]" Fed. R. Civ. P. 12(a)(1)(A)(i), it is also true that "[a]ny defendant may waive the right to reply to any action brought by a prisoner confined in any jail, prison, or other correctional facility under section 1983 of this title or any other Federal law[,]" 42 U.S.C. § 1997e(g)(1). In fact, the Court's recent report addresses this issue – as well as Fed. R. Civ. P. 55 – when recommending that the Court deny Plaintiff's motion for entry of default judgment against Defendant Parsons. (*See* ECF No. 26, PageID.232-235.)

[3] Plaintiff also submits Floyd Chambers' December 7, 2019 unnotarized affidavit, which describes the alleged events of October 2019. (ECF No. 1, PageID.15-16;

3

this point, it is helpful to note the MDOC's Policy Directive on "Prisoners' Access

to the Courts," which explains:

> Prisoners have a constitutional right of access to the courts that may
> not be arbitrarily impeded.  No retaliation may be taken against a
> prisoner who has filed a lawsuit or is pursuing litigation.  . . .

MDOC PD 05.03.116 ¶ A, effective Sept. 16, 2019.  (ECF No. 22-1.)  However,

the policy also contains provisions governing "legal photocopying services" and

the "legal writer program."  (*Id.*, ¶¶ N-W.)[4]

On October 4, 2019, Plaintiff was doing some research in the law library,

when he overheard Librarian Elum tell Prisoner Chambers that she "was not going

to copy his application because it wasn't an original copy."  (ECF No. 1, ¶ 6.)

Plaintiff told Librarian Elum that he "agreed to help," because "he wouldn't have

otherwise been able to meet his court filing deadline."  (ECF No. 1, ¶ 7.)[5]

According to Plaintiff, Librarian Elum told Plaintiff he "didn't have anything to do

with matters involving Prisoner Chambers['] legal work and stated that she wasn't

going to copy Prisoner Chambers carbon copied application."  (ECF No. 1, ¶ 8.)

---

ECF No. 180-181.)

[4] In his response, Plaintiff relies upon a September 15, 2017 version of JCF
Operating Procedure 05.03.116.  (ECF No. 14, PageID.176-179.)

[5] *See People v. Chambers*, Case No. 2000-000751-FC (Kalamazoo Circuit Court)
and Case No. 350998 (Mich. App.).  (ECF No. 14, PageID.182, 184.)

4

Plaintiff attempted another explanation, but Librarian Elum gave a similar answer. (ECF No. 1, ¶ 9.)  Plaintiff "exited the library and went to the restroom."  (ECF No. 1, ¶ 10.)

On his way back into the library, Plaintiff spoke with the Warden.  After explaining the situation with Chambers, the Warden wrote Prisoner Chambers' name and number on a piece of paper and "stated that he would check into the matter."  (ECF No. 1, ¶ 11.)  When Plaintiff returned to the library, he and Librarian Elum spoke about Chambers; according to Plaintiff, Elum stated, "don't you worry Mr. Johnson, I know how to get rid of prisoners like you who speak up for other prisoners."  (*Id*., ¶ 12.)  Plaintiff told Elum that he only explained to the Warden "how a carbon copy is used as the original and that Prisoner Chambers needed a specific number of copies made of his application for submission to the [state] court."  (*Id*., ¶ 13.)  Again, Elum gave a similar response.  (*Id*., ¶ 14.)  Plaintiff packed up his legal materials and left the library.  (*Id*., ¶ 15.)

On October 4, 2019, Plaintiff initiated an MDOC Prisoner Grievance – **JCF-2019-10-1861-17B** – against Elum, as did Chambers.  (ECF No. 1, ¶ 16; *id*., PageID.16 ¶ 11; ECF No. 14, PageID.183 [JCF-19-10-01862-14f].)  ADW Kisor interviewed Plaintiff on October 9, 2019, during which time Plaintiff twice told ADW Kisor that he (Plaintiff) did not want to sign off on the grievance; then, ADW Kisor allegedly commented that "Librarian Elum told her [Kisor] that

5

[Plaintiff] was a 'Legal Beegal' and said that [Plaintiff] would find out how things work[] here at JCF." (*Id.*, ¶¶ 17-18.)  ADW Kisor signed the Step I grievance response, and DW Howard reviewed it.  (ECF No. 1, PageID.23-24; ECF No. 8-3, PageID.140-141.)  Several weeks later, Plaintiff completed a Step I grievance form against ADW Kisor regarding the October 9, 2019 interview, although the grievance also mentioned later events.  (ECF No. 1, PageID.38 [**JCF-2019-11-2207-28E**].)

Meanwhile, on October 14, 2019, Plaintiff received his Step I response in **JCF-2019-10-1861-17B**.  (ECF No. 1, ¶ 19.)  On October 18, 2019, Plaintiff filed his Step II appeal.  (ECF No. 1, ¶ 20.)  According to Plaintiff, two things happened on October 22, 2019:  (a) in the morning, when he was in the law library, he observed ADW Kisor and Elum "in the library office talking with the door closed[,]" and, on two occasions, he noticed them staring at him; and, (b) he was informed that he should receive a Step II response no later than November 12, 2019.  (ECF No. 1, ¶¶ 21-22.)

On October 24, 2019, Michelle L. Parsons completed an MDOC Security Classification Screen for the purpose of transfer.  (ECF No. 1, PageID.17-18.)  His confinement level was II, and his new management score was 0 (*i.e.*, Management Level I).  (*Id.*)  DW Jeremy Howard approved a true security level of II, which was also Plaintiff's actual placement level.  (*Id.*)  (*See also* ECF No. 1, ¶ 23.)  On or

about the same date, Plaintiff filed grievances against Parsons and DW Howard –

**JCF-2019-11-2166-28E** and **JCF-2019-11-2167-28E** – concerning the events of

October 24, 2019.  (ECF No. 1, PageID.28, 33; ECF No. 8-3, PageID.130, 135.)

On October 29, 2019, Plaintiff learned that he would be "riding out in the

morning."  (ECF No. 1, ¶¶ 24-25.)  He was transferred to URF on October 30,

2019.  (*Id*., ¶ 26.)  Upon receiving a copy of the Security Classification Screen,

Plaintiff wrote transfer-related letters to JCF ARUS Parsons and JCF DW Howard,

each of which appears to have been accompanied by an MDOC Step I grievance

form, although these do not bear grievance identifier numbers.  (*Id*., PageID.19-

22.)  (*See also* ECF No. 1, ¶ 27.)

Plaintiff alleges that his transfer "was nothing but a retaliatory action taken

against [him] as a result of [him] assisting Prisoner Chambers with his legal work,

and the filing of a grievance against the Librarian (Elum)[,]" seemingly in

contravention of MDOC PD 05.03.116 ("Prisoners' Access to the Courts").  (ECF

No. 1, ¶¶ 1, 28-29; *see also* ECF No. 22-1, ¶ A.)  He was transferred back to JCF

on November 13, 2019, approximately two weeks after his transfer to URF.  (ECF

No. 8-3, PageID.130, 135.)

### 2.    Exhaustion

Defendants contend that Plaintiff has "failed to exhaust administrative

remedies on his claims."  (ECF No. 8, PageID.81-89.)  In relevant part, the Prison

Litigation Reform Act (PLRA) provides:  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[F]ailure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."  *Jones v. Bock*, 549 U.S. 199, 216 (2007).  "[T]he PLRA exhaustion requirement requires proper exhaustion."  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Jones*, 549 U.S. at 218.

Plaintiff's MDOC Prisoner Step III Grievance Report lists multiple Grievance Identifiers, six of which are attributable to JCF, although it seems only four are relevant to the matter at bar:  (a) JCF-2019-10-1861-17B; (b) JCF-2019-11-2166-28E; (c) JCF-2019-11-2167-28E; and, (d) JCF-2019-11-2207-28E.  (ECF No. 1, PageID.23-42; ECF No. 8-3, PageID.109-110, 122-141.)[6]  Even though it is

---

[6] As for the other two JCF grievances that were appealed to Step III, JCF-18-06-1459-27B was initiated before the October 2019 incidents at issue in this case and JCF-2020-04-0688-17I seems to be more of a grievance against non-party Corrections Officer Miller, although it does claim that Plaintiff first attempted to

not his burden, Plaintiff cites these grievances in his pleading to illustrate his

exhaustion of administrative remedies against Defendants Elum, Parsons, DW

Howard and ADW Kisor.  (ECF No. 1, ¶ 30, 32-35.)

### a.    JCF-2019-10-1861-17B (Librarian Elum)

Plaintiff filed this grievance against Elum regarding the alleged events of

October 4, 2019.  (ECF No. 1, PageID.23-27; ECF No. 8-3, PageID.137-141.)

ADW Kisor denied the grievance as having "no merit," and DW Howard reviewed

the response.  (*Id*.)  This grievance was denied at Step II and at Step III.  (*Id*.)

Accordingly, the Court should consider whether the issue exhausted by JCF-

2019-10-1861-17B aligns with Plaintiff's claims against Defendant Elum.

Plaintiff's Step I grievance concerning the events of October 4, 2019 embodies

several paragraphs of Plaintiff's complaint that describe alleged events of the same

date.  (*Compare* ECF No. 1, ¶¶ 12-14, *with* ECF No. 8-3, PageID.140.)  As a

result, the claims against Elum that are within these paragraphs – and perhaps other

paragraphs related to alleged October 4, 2019 events in the law library involving

Defendant Elum (*see* ECF No. 1, ¶¶ 6-9, 11-15) – have been exhausted.  Whether

these allegations state a claim upon which relief may be granted is addressed

---

resolve the issue by writing a letter to the Warden.  (*See* ECF No. 8-3, PageID.109-
110, 117-121.)

9

below.  Conversely, any allegations against Elum concerning later events – *e.g.*, the events of October 22nd or October 29th and playing a part in his October 30th transfer to URF (ECF No. 1, PageID.11-12 ¶¶ 21, 24-26) – are not exhausted by this grievance.  (*See also* ECF No. 14, PageID.172.)

  **b.**  **JCF-2019-11-2166-28E (ARUS Parsons) & JCF-2019-11-2167-28E (DW Howard)**

   Plaintiff filed these grievances against ARUS Parsons and DW Howard based on the October 24, 2019 "Security Classification Screen."  (ECF No. 1, PageID.17-18, 28-37; ECF No. 8-3, PageID.127-136; *see also* ECF No. 1, ¶ 23.)[7] Preliminarily, as discussed above, Plaintiff transferred from JCF to URF on October 30, 2019.  (ECF No. 1, ¶ 26.)  Apparently on that same date, he wrote letters to ARUS Parsons and DW Howard regarding his transfer to URF, each of which was accompanied by an MDOC Step I grievance form, although these do not bear grievance identifier numbers.  (ECF No. 1, PageID.19-22; *see also id*., ¶ 27.)  Plaintiff claims to have been transferred back to JCF on November 13, 2019. (ECF No. 8-3, PageID.130, 135.)

---

[7] Neither Plaintiff's claims against Howard (ECF No. 1, PageID.12 ¶¶ 23, 27) nor his grievance against Howard (ECF No. 1, PageID.33) take issue with Howard's October 10, 2019 review of JCF-1861 (ECF No. 1, PageID.23-24, ECF No. 8-3, PageID.140-141).  Even if they did, Howard "cannot be liable under § 1983" where his "only role[] . . . involve[s] the denial of administrative grievances or the failure to act[,]" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Plaintiff's grievances are dated November 14, 2019, the day after he alleges

he was returned to JCF.  (*Id*.)  On November 21, 2019, the grievances were

rejected as untimely and each provided the following explanation:

> The Step I Grievance Office staff have carefully examined the
> content of your Step I grievance.  This examination reveals that
> you have exceeded your time limits in filing a grievance on
> issue(s) that concern you, and at the same time provided no
> reasonable circumstance beyond your control that would have
> prevented you from filing this grievance in a timely fashion.
> This office is retur[n]ing you[r] grievance to you without
> investigation for these reasons.  If you have further questions
> consult OP 03.02.130, which is available in the institutional
> library.

(*Id*., PageID.131, 136.)  *See* MDOC PD 03.02.130 ¶¶ J(5), Q, W (effective Mar.

18, 2019).  The rejections were upheld at Steps II and at Steps III.  (ECF No. 8-3,

PageID.127, 129, 132, 134.)

Plaintiff and Defendants are at odds as to whether these grievances were

properly rejected as untimely, considering that "[t]he grievance shall not be

rejected if there is a valid reason for the delay; e.g., transfer."  MDOC PD

03.02.130 ¶ J(5).  Defendants argue that "Johnson did not file the Step I grievance

within the time-period mandated under MDOC Policy."  (ECF No. 8, PageID.88.)

According to Plaintiff, a transfer-related delay is what occurred in his case.  (ECF

No. 14, PageID.162 ¶ 11.)

11

As to the grievance against Parsons (JCF-2019-11-2166-28E), Plaintiff contends that October 30, 2019 – the date on which he received a copy of his transfer papers – is the date "he learned Defendant Parsons was the person who filed his transfer papers." (ECF No. 14, PageID.162 ¶ 12.) That same day he wrote transfer-related letters to JCF ARUS Parsons and JCF DW Howard, each of which appears to have been accompanied by an MDOC Step I grievance form, although these do not bear grievance identifier numbers. (ECF No. 1, PageID.19-22; *id*., ¶ 27; see also ECF No. 14, PageID.162 ¶ 12.) Plaintiff claims he never received an acknowledgment from the JCF grievance coordinator; therefore, when he transferred back to JCF on November 14, 2019, he "filed a second grievance against Defendant Parsons." (ECF No. 14, PageID.162-163 ¶ 13.) Similarly, as to the grievance against Howard (JCF-2019-11-2167-28E), Plaintiff claims he "did not learn that Defendant Howard was the person who signed the papers approving his transfer until [October 30, 2019][,]" on which date he "wrote a letter to Defendant Howard and filed a grievance against [him] . . . ." (ECF No. 14, PageID.163 ¶ 14.) Yet, Plaintiff claims he did not receive an acknowledgment from the JCF grievance coordinator. (*Id*.) When he transferred back to JCF on

12

November 14, 2019, he "filed a second grievance against . . . Howard." (*Id.*, ¶ 15.)[8]

Notwithstanding Plaintiff's explanation in response (ECF No. 14, PageID.162-163 ¶¶ 12-15), Defendants' reply does little to address this issue. Other than noting that the grievances were rejected as untimely and that the rejections were upheld, Defendants contend that "Johnson did not present sufficient information at Step I which would excuse the untimeliness of his grievances[;]" thus, the "MDOC correctly rejected those grievances." (ECF No. 22, PageID.214-215.) Essentially, this is a rephrasing of the Step I grievance rejection, *i.e.*, Plaintiff "provided no reasonable circumstance beyond [his] control that would have prevented [him] from filing th[ese] grievance[s] in a timely fashion." (ECF No. 8-3, PageID.131, 136.)

In the current matter, Plaintiff has submitted copies of the alleged October 30, 2019 letters to and grievances concerning ARUS Parsons and DW Howard. (ECF No. 1, PageID.19-22.) Had these grievances been processed and assigned a Grievance Identifier Number, the Court suspects they may not have been rejected as untimely, as they concerned Defendants Parsons and Howard's alleged

---

[8] The Court recognizes that this alleged transfer date differs by one day from the date listed in his grievances. (*Compare* ECF No. 8-3, PageID.130, 135; *with* ECF No. 14, PageID.162-163 ¶¶ 13, 15.)

participation in Plaintiff's October 24 Security Classification Screen and/or his
October 29 or 30 transfer from JCF to URF.  (*Id.*, PageID.20, 22.)  Also, it
certainly seems that Plaintiff's intervening two weeks at URF – from
approximately October 29 or 30 to November 13 or 14 – could have played a part
in the timeliness of these grievances.  Therefore, on the present record, the Court
"can reasonably disagree with the MDOC's response" that these grievances are
untimely, or the Court can reasonably conclude that these grievances should not
have been rejected due to his JCF-URF-JCF transfer.  *See Kitchen v. Winn*, No.
2:17-CV-11627, 2018 WL 2326673, at *6 (E.D. Mich. Apr. 20, 2018) (Patti, M.J.)
(citing *Reeves v. Salisbury*, No. 11-CV-11830, 2012 WL 3206399, at *5 (E.D.
Mich. Jan. 30, 2012) (Michelson, M.J.) ("the Court is not required to blindly accept
the state's application of the procedural rule.")) and *Griffin v. Berghuis*, No. 11-
14876, 2016 WL 1165826, at *8 (E.D. Mich. Jan. 3, 2016) (Hluchaniuk, M.J.)
(quoting *Reeves*).

Accordingly, the Court should agree with Plaintiff that he has "provided
sufficient facts" to establish that his transfer is the reason his grievances against
Parsons and Howard "were not timely filed . . . ."  (ECF No. 14, PageID.163 ¶ 16.)
Moreover, having been appealed through Step III, the Court should conclude that
JCF-2019-11-2166-28E and JCF-2019-11-2167-28E properly exhaust claims

within his complaint regarding the matters of which these grievances complain. *Kitchen*, 2018 WL 2326673, at *6.

### c.  JCF-2019-11-2207-28E (ADW Kisor)

Plaintiff filed this grievance against ADW Kisor based on the October 9, 2019 interview in the grievance against Librarian Elum, *i.e.*, JCF-2019-10-1861-17B (and presumably also Kisor's same-day Step I grievance response), but he also mentions the following sequence of events:  (i) Plaintiff's October 18, 2019 Step II grievance; (ii) the October 24, 2019 "Security Classification Screen;" and, (iii) Plaintiff's October 29, 2019 transfer to URF (ECF No. 1, PageID.38-42; ECF No. 8-3, PageID.122-126), although Plaintiff elsewhere claims the transfer took place on October 30, 2019 (ECF No. 1, ¶ 26).  Interestingly, the grievance mentions the alleged events of October 9, 2019 but does not mention the alleged October 22, 2019 conversation between Kisor and Elum.  (*Compare* ECF No. 1, ¶¶ 17-19, 21; *with id.*, PageID.38.)  Plaintiff's grievance concludes by contending that his transfer "was unauthorized and done for retaliatory reasons."  (ECF No. 8-3, PageID.125.)

As noted above, Plaintiff returned to JCF on November 13, 2019, and, on or about November 15, 2019, Plaintiff wrote to Kisor seeking placement back into his porter job and educational programs.  (ECF No. 8-3, PageID.130, 135; ECF No. 14, PageID.185.)  A handwritten response, presumably authored by Kisor – and

15

which is difficult to read on the docket but for which Plaintiff's clarification aids

the Court – states: "I have no idea why you were transferred but you were

transferred back due to medical app[ointment]s. Elum as I told you cannot have

someone transferred since we are unaware that you even transferred. I can't [get

you your job back][.]" (*Id*., PageID.172-173, 185.)

Plaintiff's Step I grievance is dated November 21, 2019. (ECF No. 8-3,

PageID.125.) On November 25, 2019, it was rejected as untimely, with the same

explanation used in the grievances against Parsons and Howard:

> The Step I Grievance Office staff have carefully examined the content
> of your Step I grievance. This examination reveals that you have
> exceeded your time limits in filing a grievance on issue(s) that
> concern you, and at the same time provided no reasonable
> circumstance beyond your control that would have prevented you
> from filing this grievance in a timely fashion. This office is
> retur[n]ing you[r] grievance to you without investigation for these
> reasons. If you have further questions consult OP 03.02.130, which is
> available in the institutional library.

(*Id*., PageID.126; *see also* MDOC PD 03.02.130 ¶¶ Q, W.) The rejection was

upheld at Step II and at Step III. (ECF No. 8-3, PageID.122, 124.)

Although Plaintiff's response specifically addresses Elum, Parsons and

Howard (ECF No. 14, PageID.159-164, 168-174), Plaintiff applies the same

arguments to Kisor (ECF No. 16, PageID.192 ¶ 5). Here, too, Defendants contend

that the MDOC "correctly rejected" this grievance, as Plaintiff "did not present

sufficient information at Step I which would excuse the untimeliness of his

grievances." (ECF No. 22, PageID.215.) It also appears to be a rephrasing of the Step I grievance rejection, *i.e.*, Plaintiff "provided no reasonable circumstance beyond [his] control that would have prevented [him] from filing this grievance in a timely fashion." (ECF No. 8-3, PageID.126.)

On the current record, the Court has no reason to "reasonably disagree" with the MDOC's rejection of the Kisor grievance (JCF-2019-11-2207-28E) as untimely. JCF-2207 takes issue with Kisor's October 9, 2019 interview or Step I response in the Elum grievance (JCF-2019-10-1861-17B), so it makes perfect sense that the MDOC would reject a related November 21, 2019 grievance (JCF-2019-11-2207-28E) – one dated more than forty (40) days after the action being grieved. To be sure, the November 21, 2019 Step I grievance also mentions matters that took place after Kisor's October 9, 2019 actions – *e.g.*, Plaintiff's October 18, 2019 Step II appeal of Kisor's Step I response in the Elum grievance (JCF-1861) and Parson's October 24, 2019 security classification screen which was approved by Howard and Plaintiff's October 29, 2019 transfer from JCF to URF. (ECF No. 8-3, PageID.125.) Nonetheless, whatever happened in the wake of Kisor's October 9, 2019 interview or Step I response in the Elum grievance (JCF-1861), it remains that JCF-2207 is based on an incident date of October 9, 2019. (ECF No. 8-3, PageID.125.) In other words, if Plaintiff had an issue with Kisor's October 9, 2019 actions – as he somewhat describes in his motion response

17

(ECF No. 14, PageID.171), then he could have grieved her well-before his October 30, 2019 transfer to URF.  His tardy grievance as to Kisor's October 9, 2019 actions does not become timely simply because Plaintiff's grievance happened to include allegedly offending, subsequent actions committed by other individuals.  In sum, and setting aside the fact that Defendant Kisor "cannot be liable under § 1983" where her "only role[] . . . involve[s] the denial of administrative grievances or the failure to act[,]" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), JCF-2207 would not have been timely to the extent Plaintiff intended it to grieve any October 9, 2019 action by Kisor that was unrelated to her role in JCF-1861.

### 3.    Stating a claim upon which relief may be granted

In addition to their exhaustion argument, Defendants seem to argue that Plaintiff has "fail[ed] to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  As set forth above, Plaintiff alleges that Defendants engaged in retaliatory conduct.  (ECF No. 1, ¶¶ 1, 28-29, 32-35.)  "A retaliation claim essentially entails three elements:

(1)    the plaintiff engaged in protected conduct;

(2)    an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and

(3)    there is a causal connection between elements one and two— that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

18

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  Defendants contend that Plaintiff "has failed to plead how MDOC Defendants were each personally involved in any unconstitutional conduct."  (ECF No. 8, PageID.89-92.)

### a.    Librarian Elum

Although Plaintiff mentions "talking to the Warden about [Elum's] refusal to copy Prisoner Chambers legal documents," as a possible form of protected conduct (ECF No. 1, ¶ 32), Plaintiff's retaliatory transfer claim against Elum seems to be based on only two forms of alleged protected conduct – "assisting Prisoner Chambers with his legal work," and "filing . .. a grievance against the Librarian (Elum)."  (ECF No. 1, ¶ 28; *see also* ECF No. 1, PageID.7, ¶ 1.)  This interpretation is confirmed by the organization of Plaintiff's response brief.  (ECF No. 14, PageID.168-174.)

### i.    Assisting inmate Chambers with his legal work

As explained above, Plaintiff alleges that he assisted inmate Chambers with his legal work in early October 2019.  (ECF No. 1, PageID.7-10 ¶¶ 2-16.)  In the Sixth Circuit:

> It is clear . . . that an inmate does not have an independent right to help other prisoners with their legal claims. *See Gibbs v. Hopkins,* 10 F.3d 373, 378 (6th Cir.1993).  Rather, a "jailhouse lawyer's" right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts; prison officials may prohibit or limit jailhouse lawyering unless doing so interferes with an inmate's ability to present

his grievances to a court.  *Id.*  Thus, only if X's assistance is necessary to vindicate Bell's right of access to the courts can X, too, state a claim of retaliation.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999).  Moreover,

> While it is true that a prisoner has a First Amendment right to file grievances against prison officials, *see Noble v. Schmitt,* 87 F.3d 157, 162 (6th Cir.1996), "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one."  *Thaddeus–X,* 175 F.3d at 395.  Thus, while a prisoner may have a right to file grievances against prison officials, he or she cannot exercise that right in a manner that violates legitimate prison regulations or penological objectives.  *See Ward v. Dyke,* 58 F.3d 271, 274 (6th Cir.1995) ("The ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management.").

*Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (internal footnote omitted).

The parties are at odds as to whether Plaintiff was engaged in protected conduct when he assisted inmate Chambers with his legal work.  Defendants point out that "Johnson was not a legal writer assigned to assist prisoner Chambers," and contend that MDOC PD 05.03.116 "prohibits Johnson from assisting Chambers with his legal paperwork."  (ECF No. 8, PageID.87.)  Indeed, Defendant Kisor's October 9, 2019 Step I grievance response explains, *inter alia*, that Johnson was "violating policy" – presumably the "Legal Writer Program" provisions (ECF No. 22-1, ¶¶ S-W) – by "involving himself in another prisoners legal matters/work." (ECF No. 8-3, PageID.141.)  Therefore, they contend, "Johnson's assistance of

20

Chambers is not 'protected activity' for First Amendment purposes."  (ECF No. 8,

PageID.87.)

In response, Plaintiff contends that the following portion of JCF Operating

Procedure 05.03.116 "establishes that [he] was allowed to assist prisoner

Chambers with his legal work . . .[:]

**Legal Assistance from Other Prisoners**

The Department is not required to ensure that a prisoner who does not
have an attorney is provided assistance from other prisoners in legal
matters, nor is any facility required to establish a procedure or
mechanism that ensures a prisoner the opportunity to provide such
assistance or services to other prisoners. However, facilities shall not
prohibit prisoners without counsel from requesting legal assistance
from other prisoners within the same facility who may have the skills
or ability to assist with litigation, nor shall any reprisals be made
against a prisoner who assists other prisoners with legal matters. A
prisoner who provides legal assistance shall not directly or indirectly
receive compensation in money, goods or services for providing such
assistance.

(ECF No. 14, PageID.160 ¶¶ 4-5, *id.*, PageID.168, 177.)  As for whether this is

protected conduct, the Sixth Circuit has instructed that "[h]elp[ing] other prisoners

with their legal claims . . . is protected . . . when the inmate *receiving the*

*assistance* would otherwise be unable to pursue legal redress."  *Herron v.*

*Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) (emphasis added).  Plaintiff points to

Chambers' unnotarized affidavit (which describes the alleged events of October

2019), Chambers' grievance, and the Michigan Court of Appeals' October 17,

2019 letter acknowledging receipt of Chambers' state court case papers.  (ECF No. 14, PageID.161 ¶¶ 6-8; *see also id.*, PageID.180-181, 183-184.)  Plaintiff advocates that the assistance he provided to Chambers constitutes "protected activity" for purposes of a First Amendment claim, even if Plaintiff was not formally Chambers' legal writer.  (ECF No. 14, PageID.160-162, ¶¶ 9-10; *see also id.*, PageID.174.)

Plaintiff "may establish protected conduct by proving not that he was the *only* person who could assist [Chambers], but that [Chambers] needed assistance and had no reasonable alternative but to seek that assistance from another prisoner." *Evans v. Vinson*, 427 F. App'x 437, 446 (6th Cir. 2011).  *See also King v. Zamiara*, 150 F. App'x 485, 492 (6th Cir. 2005) ("King's legal assistance to other inmates constituted protected conduct because those he assisted had no reasonable alternatives for other legal assistance."); *Crump v. Prelesnik*, No. 1:10-CV-353, 2013 WL 1337790, at *1 (W.D. Mich. Mar. 29, 2013) ("Since Crump's assistance was not necessary to vindicate other prisoners' rights of access to the courts, he cannot state a claim that he was retaliated against for assisting other prisoners.") (citing *Thaddeus–X,* 175 F.3d at 395), *aff'd* (Aug. 4, 2014). Plaintiff explains that, when Prisoner Chambers "noticed that the legal writer had included some information in the application which should not have been included[,]" Chambers sought Plaintiff's assistance, "because he would not have

been able to submit a kite to the library to be placed onto the callout to see the legal writer for correction of the application in time enough to make his court filing deadline[.]"  (ECF No. 14, PageID.168-169; *id.*, PageID.180 ¶¶ 2-3 [Chambers' Unnotarized Affid.].)  (*See also* ECF No. 14, PageID.173.)  As Plaintiff puts it, "Chambers was subjected to some type of extraordinary situation which prevented him from seeking assistance form the prison legal writer in time enough for him to make his court filing deadline," leaving Chambers "no alternative but to seek assistance from Plaintiff."  (ECF No. 14, PageID.170.)

On this issue, Defendants have the better argument.  In their reply, they contend that no one interfered with or hindered Johnson from assisting Chambers with typing a carbon copy or working on Chambers' legal paperwork in the housing unit.  (ECF No. 22, PageID.214-215.)  More to the point, Defendants contend that Johnson's actions "were outside what was permissible under MDOC P.D. 05.03.116."  (*Id.*, PageID.214.)  They explain that, at the point when "Elum informed Chambers that he could not [get copies of a carbon copy] because it was not an original copy[,]" Plaintiff "inserted himself into the conversation between Elum and Chambers—a conversation which Johnson was not entitled to because he was not Chambers' attorney or legal writer, and because Chambers is not entitled to any assistance . . . when dealing with staff with his own legal work."  (*Id.*, PageID.214-215.)  Plaintiff's complaint does not seem to allege interference with

23

his *substantive* efforts – *e.g.*, retyping Chambers' state court application for leave to appeal and preparing the envelope for mailing – to help Chambers.  (*See* ECF No. 1, ¶¶ 2-5, 10.)  Accordingly, to the extent Plaintiff's claims against Elum concern the alleged October 4, 2019 events in the law library (¶¶ 6-9, 11-15), the Court should agree with Defendants that Plaintiff was not entitled to have *the October 4, 2019 library encounter* under MDOC PD 05.03.116; thus, "the encounter was not protected activity[.]"  (*Id.*, PageID.215).

### ii.     Filing a grievance against Librarian Elum

On October 4, 2019, Plaintiff initiated a grievance against Elum – JCF-2019-10-1861-17B.  (ECF No. 1, PageID.23.)  "An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron*, 203 F.3d at 415.  Defendants do not dispute that Plaintiff was engaged in protected conduct when he initiated JCF-2019-10-1861-17B against Elum in early October 2019.  (ECF No. 8, PageID.87.)  Rather, they argue that if the grievance is the protected conduct, then it cannot also "exhaust administrative remedies against Elum."  (*Id.*, PageID.87-88.)

The Court should agree.  If the grievance initiated against Elum on October 4, 2019 – JCF-2019-10-1861-17B – is the protected conduct, and if the late October transfer from JCF to URF is the alleged adverse action, then the early October 2019 grievance does not operate to exhaust Plaintiff's retaliation claim

24

against Elum.  It would only operate to exhaust Plaintiff's claims regarding the alleged October 4, 2019 events in the law library involving Defendant Elum (ECF No. 1, ¶¶ 6-9, 11-15), which encounter did not constitute protected conduct.

### iii.    The October 30, 2019 transfer to URF

In his pleading, Plaintiff states that this grievance was filed for *Elum's "threatening words of knowing how to get rid of prisoners like [him]."*  (ECF No. 1, PageID.10 ¶ 16 (emphasis added).)  (ECF No. 14, PageID.171.)  Setting aside the fact that Defendants' motion does not focus on the "adverse action" element, Plaintiff contends that Defendant Elum "made good on her threat, and had Plaintiff transferred to the upper peninsula[,]" which resulted in loss of "a steady income from his prison job" and participation in the "Chance for Life" prison program . . . ."  (ECF No. 14, PageID.174.)  Whether a transfer constitutes adverse action is fact specific.  *Compare Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009) (potentially adverse action where Defendant threatened "first, to have him moved out of the unit so that he would lose his job" and, "second, to use her influence with a warden to have him moved to a location where his family would not be able to visit him."); *with, Friedmann v. Corr. Corp. of Am.*, 11 F. App'x 467, 471 (6th Cir. 2001) ("a mere transfer to another institution of the same security level, with no other aggravating factors, is not sufficiently adverse to deter a person of ordinary firmness from engaging in the exercise of protected First Amendment

25

activity.") and *Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir. 2003) (concluding that "threats to transfer Plaintiff to another prison" did not "constitute adverse action.").

Nonetheless, at least as it relates to Plaintiff's claim against Librarian Elum, this report does not address whether Plaintiff's late October 2019 transfer to a correctional facility in Michigan's Upper Peninsula – including URF's alleged confiscation of his television as "altered contraband[,]" (ECF No. 1, PageID.12 ¶ 26) – is an adverse action, because such claims were not exhausted by JCF-2019-10-1861-17B. If Plaintiff wished to exhaust his available administrative remedies as to a claim that Elum retaliated against him for his October 4th initiation of JCF-1861 – by her alleged October 22nd or October 29th actions and playing a part in his October 30th transfer to URF (ECF No. 1, PageID.11-12 ¶¶ 21, 24-26) – then such actions would need to be the subject of a *subsequent* grievance against her. (*See also* ECF No. 14, PageID.172.) Plaintiff would have needed to file a grievance against Elum *after* the alleged adverse action.

### b.    Parsons and Howard

Plaintiff alleges that Parsons and Howard each "willfully participated in the 'retaliatory' transfer of Plaintiff on behalf of Defendant Elum . . . ." (ECF No. 1, ¶¶ 33-34.) Yet, it seems that Plaintiff's only allegations against Parsons and Howard concern the October 24, 2019 Security Classification Screen, which

assessed a confinement level based on his life sentence and an unchanged

management level.  (ECF No. 1, PageID.12 ¶¶ 23, 27; *id*., PageID.18.)

To be sure, the Court could speculate about motivation.  For example, the

Court recognizes that Parsons and Howard's October 24, 2019 Security

Classification Screen occurred *after* the alleged October 9, 2019 protected conduct.

*Thaddeus-X*, 175 F.3d at 399 ("Circumstantial evidence, like the timing of events . .

. , is appropriate.").  Also, the form's "Purpose of Screen" says nothing more than

"Transfer."  (ECF No. 1, PageID.18.)  Moreover, the grievance-related attachments

to Plaintiff's pleading allege, *inter alia*, that:  (i) Parsons was not the counselor for

Plaintiff's housing unit and, thus, "was not authorized to prepare a screen for

transfer on [his] behalf . . . [;]" and, (ii) Plaintiff "never received a Class I

Misconduct[,]" (ECF No. 1, PageID.21-22, 28, 33.)

However, even Plaintiff admits that Parsons and Howard's motivation is

"unclear."  (ECF No. 14, PageID.174.)  To that end, the Court notes there are

multiple MDOC Policy Directives that govern classification and/or placement

decisions.[9]  Perhaps the transfer was "initiated by a Security Classification

Committee (SCC) . . . ."  MDOC PD 05.01.140 ¶ C (effective Nov. 1, 2017).  Also,

while Plaintiff points out that he did not receive a Class I misconduct ticket, the

---

[9] *See*, *e.g.*, MDOC PD 05.01.130 ("Prisoner Security Classification"), MDOC PD
05.01.140 ("Prisoner Placement and Transfer").

policy paragraph on which he seemingly relies also provides:  "This does not apply to temporary transfers for medical, psychiatric, or other treatment unrelated to security needs."  MDOC PD 05.01.130 ¶ I(2) (effective Oct. 10, 2011).  Here, the Court declines an invitation to infer that Parsons and Howard were acting in a nefarious manner when they completed Plaintiff's Security Classification Screen. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Thus, even if JCF-2019-11-2166-28E and JCF-2019-11-2167-28E properly exhaust Plaintiff's claims against Parsons and Howard, Plaintiff has not alleged "enough facts" to state a retaliation claim against them "that is plausible on its face."  *Twombly*, 550 U.S. at 570.

### c.    Kisor

Plaintiff's claims against Kisor concern the events of October 9, 2019 and October 22, 2019.  (ECF No, 1, PageID.10-11 ¶¶ 17-19, 21; *see also* ECF No. 1, PageID.24; ECF No. 14, PageID.185.)  Plaintiff alleges that ADW Kisor "willfully participated in the 'retaliatory' transfer of Plaintiff for assisting Prisoner Chambers . . . with his legal work and refusing to sign off on the grievance against Librarian Elum . . . ."  (ECF No. 1, ¶ 35.)

Defendants contend that Plaintiff failed to plead how Defendant Kisor was "personally involved in any unconstitutional conduct." (ECF No. 8, PageID.91-92.) However, given the foregoing conclusion that Plaintiff did not – via JCF-2019-11-2207-28E – properly exhaust his available administrative remedies as to his claims against Defendant Kisor, the Court need not consider whether Plaintiff adequately alleged Kisor's personal involvement in such claims.

### 4.   Eleventh Amendment

In their third and final argument, Defendants contend that "Johnson has failed to state § 1983 claims against MDOC Defendants in their official capacities." (ECF No. 8, PageID.92-94.) Preliminarily, if the Court agrees with the foregoing recommendations that Plaintiff's claims are either not properly exhausted or do not state a claim upon which relief may be granted, then it need not address this argument. However, even if Plaintiff's claims against Defendants were to survive summary judgment, to the extent Plaintiff sues Defendants in their official capacity and for money damages, those claims are barred by the Eleventh Amendment. Where a plaintiff sues a defendant in his or her official capacity, it "is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989).

Here, Plaintiff brings his claims against all Defendants in their official and personal capacities, and, as noted above, he seeks compensatory and punitive

damages.  (ECF No. 1, PageID.1-2, 5-6.)  Plaintiff's claims against Defendants in their official capacities, therefore, are claims against the State of Michigan, and "the Eleventh Amendment bars a damages action against a State in federal court."  *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).  Put another way, "[t]his bar remains in effect when State officials are sued for damages in their official capacity."  *Id.* at 169 (internal citation omitted).  Thus, even if the Court disagrees with the foregoing recommendation as to Plaintiff's claims for money damages against Defendants in their personal capacities, the Eleventh Amendment remains a bar to Plaintiff's claims for money damages against Defendants in their official capacities, and such § 1983 claims should be dismissed.

### D.     Conclusion

In sum, JCF-2019-10-1861-17B properly exhausted only certain claims against Elum – the alleged October 4, 2019 events in the law library (ECF No. 1, ¶¶ 6-9, 11-15) – but not others (*id.*, ¶¶ 21, 24-26); and, even where it exhausted Plaintiff's claims, Plaintiff was not engaged in protected conduct.  Also, even if JCF-2019-11-2166-28E and JCF-2019-11-2167-28E properly exhaust Plaintiff's claims against Parsons and Howard (ECF No. 1, ¶¶ 23, 27), Plaintiff has not alleged "enough facts" to state a retaliation claim against them "that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Finally, JCF-2019-11-2207-28E did not properly exhaust Plaintiff's available administrative remedies as to his claims

30

against Defendant Kisor (ECF No. 1, ¶¶ 17-19, 21).  Accordingly, the Court should **GRANT** Defendants' motions for summary judgment (ECF Nos. 8, 12, 19).  If the Court agrees that Plaintiff's claims against these Defendants (ECF No. 1) are either not properly exhausted or fail to state a claim upon which relief may be granted, then this matter is concluded.

## III.    PROCEDURE ON OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an

31

objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: July 21, 2021

_____
Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE

32