UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE ANTHONY
JOHNSON,

              Plaintiff,

v.

HATATU ELUM, *et al*.,

              Defendants.

_____/

Case No. 4:20-cv-12422

District Judge Matthew F. Leitman

Magistrate Judge Anthony P. Patti

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 45)</u>

**I.  RECOMMENDATION**: The Court should **GRANT** Defendants' motion for summary judgment.  (ECF No. 45.)  If the Court agrees, this matter is concluded.

**II.  REPORT**

    **A.  Background**

        **1.  Factual Background**

Plaintiff Dwayne Anthony Johnson is currently incarcerated at the Michigan Department of Corrections (MDOC) Lakeland Correctional Facility (LCF).  *See* www.michigan.gov/corrections.  On August 18, 2020, while incarcerated at G. Robert Cotton Correctional Facility (JCF), Johnson filed the instant lawsuit against

four Defendants (1) Hatatu Elum, identified as a JCF librarian; (2) Michelle

Parsons, identified as a JCF Assistant Residential Unit Supervisor (ARUS); (3)

Jeremy Howard, a JCF Deputy Warden (DW); and (4) T. (Tiffani) Kisor, a JCF

Assistant Deputy Warden (ADW).  (ECF No. 1.)

As summarized by the Judge Leitman in his order regarding my prior report

and recommendation:

> This action arises out of assistance that Johnson provided
> another inmate, Floyd Chambers, in connection with a court filing that
> Chambers was attempting to make.  Johnson says that in September
> 2019, Chambers asked him to re-type an Application for Leave to
> Appeal that Chambers intended to file in the Michigan Court of
> Appeals.  (*See* Compl. at ¶2, ECF No. 1, PageID.7; Chambers Aff. at
> ¶1, ECF No. 1, PageID.15.)  According to Johnson, even though the
> MDOC had not assigned him to serve as Chambers' legal writer,
> Chambers needed his help because Chambers was in serious jeopardy
> of "miss[ing] the deadline for filing his application in the [Court of
> Appeals]."  (Compl. at ¶3, ECF No. 1, PageID.8; Chambers Aff. at ¶3,
> ECF No. 1, PageID.15.)  Johnson therefore agreed to re-type
> Chambers' application on spare carbon paper that he had available.
> (*See* Compl. at ¶5, ECF No. 1, PageID.8.)  Johnson then told
> Chambers that he (Chambers) could use the prison library to make the
> number of copies of the Application for Leave to Appeal required by
> the Michigan Court of Appeals.  (*See id*.)
>
> On October 4, 2019, Johnson "was doing some research on the
> computer in the law library" when he heard Chambers speaking to
> Elum, the librarian, about making copies of his Application for Leave
> to Appeal.  (*Id*. at ¶6, PageID.8.)  According to Johnson, Elum was
> refusing to make copies of Chambers' Application for Leave to
> Appeal because it had been typed on carbon paper and was not "an
> original copy."  (*Id*.)  Chambers told Elum that he needed the copies
> made to meet his "court deadline," but Elum still refused.  (*Id*.)  At
> this point, Johnson "got off the computer and went up [the] desk to
> explain to [] Elum" that he had helped Chambers re-type his

2

application so that Chambers could "meet his court filing deadline." (*Id*. at ¶7, PageID.9.)  Elum responded that Johnson "didn't have anything to do with matters involving [] Chambers['] legal work[,] and [she] stated that she wasn't going to copy" Chambers' documents. (*Id*.)

Johnson exited the library shortly thereafter and ran into JCF's warden.  Johnson explained Chambers' situation to the warden, including the fact that Elum had refused to make copies of Chambers' legal documents and that "Chambers had a court filing deadline" that Chambers was in jeopardy of missing.  (*Id*. at ¶11, PageID.9-10.)  The warden "stated that he would check into the matter."  (*Id*., PageID.10.)

"When [Johnson] entered back into the library, [Elum] stated to [him], 'Mr. Johnson, you didn't have anything to do with the situation regarding Prisoner Chambers.[']"  (*Id*. at ¶12, PageID.10.)  Johnson then "told [] Elum that [] Chambers was a friend of [his], that he was 84 years old and didn't know anything about criminal law and procedure.  [He] told [Elum] that [] Chambers had a deadline of October 8, 2019 in which to file his legal work in the [Michigan Court of Appeals], and that he needed his copies so he [could] make his deadline."  (*Id*.)  Elum responded, "don't worry Mr. Johnson, I know how to get rid of prisoners like you who speak up for other prisoners."  (*Id*.)  Johnson then said that "the only thing [he] did was explain to the warden how a carbon copy is used as the original and that [] Chambers needed a specific number of copies made for his application."  (*Id*.)  Elum "told [him] 'not to worry because she knew how to get rid of prisoners like [him], and that [he would] find out what she [was] talking about."  (*Id*. at ¶13, PageID.10.)  Johnson interpreted Elum's comments as a threat to have him transferred from the JCF to another MDOC facility.  (*See id*.)

When Johnson returned to his housing unit from the library, he "immediately filed an institutional grievance" against Elum.  (*Id*. at ¶16, PageID.10.)  In the grievance, which Johnson attached to his Complaint, he said that "after [he] returned to the library after explaining to the warden the situation with [] Chambers['] inability to pay for copies," Elum "let [him] know that she knew how to get rid of prisoners like [him]."  (Grievance, ECF No. 1, PageID.23.)  That

grievance was heard by, and eventually rejected by, Defendant Kisor. (*See* Compl. at ¶¶ 17-19, ECF No. 1, PageID.10-11.)

Less than a month later, on October 24, 2019, Defendant Parsons conducted a "Security Classification Screen review" of [Plaintiff]. (*Id*. at ¶23, PageID.12; *see also* Security Classification Screen Review form, ECF No. 1, PageID.18.)  The "purpose" of this screening, as reflected on the review form, was "transfer."  (Security Classification Screen Review form, ECF No. 1, PageID.18.)  The review form, and Johnson's subsequent transfer, was approved by Defendant Howard.  (*See id*.)

On October 29, 2019, Johnson was not yet aware that he was going to be transferred.  While in the library, Elum walked up to him "with a smile on her face" and said, "Mr. Johnson, you take care of yourself."  (Compl. at ¶24, ECF No. 1, PageID.12.)  When Johnson asked what she meant by that comment, Elum responded "you'll find out soon enough."  (*Id*.)  The next day, Elum, was transferred to the Chippewa Correctional Facility ("URF") in the Upper Peninsula.  (*See id*. at ¶26, PageID.12.)  Johnson insists that his "transfer was nothing but a retaliatory action taken against [him] as a result of [his] assisting [] Chambers with his legal work, and the filing of a grievance against [Elum]."  (*Id*. at ¶28, PageID.13.)

After Johnson arrived at URF, he immediately "filed [] institutional grievance[s] against [] Parsons and [] Howard" arising out of his transfer.  (*Id*. at ¶27, PageID.12; *see also* Grievances, ECF No. 1, PageID.19-22.)  In these grievances, Johnson asserted that Parsons was not authorized to complete the Security Classification Screen Review form that initiated the transfer process because Parsons was not the residential unit supervisor for his housing unit. (*See* Grievances, ECF No. 1, PageID.19-20; *see also id*., PageID.28.)  Johnson did not file grievances against Elum or Kisor arising out of his transfer at that time.

(ECF No. 29, PageID.279-283.)

Judge Leitman referred this case to me for all pretrial matters.  (ECF No. 9.)

On July 21, 2021, I issued a Report and Recommendation that the Court grant

Defendants' initial dispositive motions (ECF Nos. 8, 12, 19) for failure to exhaust or state a claim upon which relief may be granted.  (ECF No. 27, PageID.237, 266-267.)  The Court adopted the recommendation in part on September 3, 2021, dismissing "(1) [Plaintiff's] retaliation claim against Elum to the extent that the claim arises out of her alleged participation in his transfer (due to his failure to exhaust that portion of his claim), (2) his retaliation claim against Kisor (due to his failure to exhaust that claim), and (3) his claims against the Defendants in their official capacities."  (ECF No. 29, PageID.285-286.)  Thus, as stated by the Court, "The only claims that remain in this case are (1) Johnson's retaliation claim against Elum arising out of her threat to transfer him and (2) Johnson's retaliation claims against Parsons and Howard for their participation in his transfer."  (ECF No. 29, PageID.290.)

### 2.    Instant Motion

On April 15, 2022, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, asserting that: (1) the legal assistance Plaintiff provided Chambers does not constitute protected conduct; (2) Plaintiff's retaliation claims must fail because he cannot demonstrate adverse action or causation; (3) to the extent Plaintiff claims conspiracy, that claim fails for the same reasons; and (4) they are entitled to qualified immunity.  (ECF No. 45, PageID.411-431.)  Plaintiff filed his response in opposition on May 3, 2022, challenging each of Defendants'

arguments and noting a discrepancy between the declarations of Parsons and Howard attached to Defendants' motion.  (ECF No. 52.)  Specifically, he noted that Parsons stated Plaintiff was transferred to accommodate a prisoner named Kent, while Howard stated he was transferred to accommodate a prisoner named Northington.  (ECF No. 52, PageID.589.)

In their May 17, 2022 reply brief, Defendants reiterated the arguments raised in their motion, but acknowledged the error in Parsons's declaration (ECF No. 53, PageID.623-624), and filed her amended declaration separately (ECF No. 59).  The Court then granted Plaintiff's motion to file a sur-response (ECF Nos. 57, 63), in which he questions why Defendants chose him for the transfer and not another prisoner without an upcoming medical appointment, and asserts that the transfer also affected his psychological and mental health (ECF No. 57, PageID.636-640).[1]

### B.    Standards

#### 1.    Fed. R. Civ. P. 56

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

---

[1] Plaintiff also seeks the appointment of counsel (ECF No. 57, PageID.640); however, any such motion should be filed separately, keeping in mind the appropriate authority. *See, e.g.*, 28 U.S.C. § 1915(e)(1); *Lavado v. Keohane*, 992 F.2d 601, 605-06 (6th Cir. 1993)).

material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The nonmoving party "must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  To survive summary judgment, one "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Furthermore, "there must be evidence upon which a reasonable jury could return a

verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted).  In other words, summary judgment is appropriate when the motion "is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case[.] . . ."  *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Moreover, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006) (internal quotations and citations omitted) .

The fact that Plaintiff is *pro se* does not reduce his obligations under Rule 56.  Rather, "liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law."  *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema, N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus., & Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).  The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a

8

party's "status as a pro se litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion").

### 2. Qualified Immunity

Section 1983 claims are subject to the affirmative defense of qualified immunity. *Regets v. City of Plymouth*, 568 F. App'x 380, 386 (6th Cir. 2014). The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stoudemire v. Mich. Dep't of Corrections*, 705 F.3d 560, 567 (6th Cir. 2013) (quotation marks and citations omitted). "In resolving a government official's qualified immunity claims, we look to whether (1) the facts that the plaintiff has alleged or shown establish the violation of a constitutional right, and (2) the right at issue was 'clearly established' at the time of the alleged misconduct." *Id.* "A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged

constitutional violation occurred." *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (quotations and citation omitted).

### C.    Discussion

####     1.    The Court should grant summary judgment on Plaintiff's claims against Defendants

Plaintiff alleges retaliation in violation of his First Amendment rights against each Defendant.  (ECF No. 1, PageID.7, ¶ 1; ECF No. 1, PageID.13-14, ¶¶ 32-34.)[2]

"A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

#####          a.    Defendants have failed to properly support their argument that Plaintiff's assistance to prisoner Chambers is not protected conduct

---

[2] Defendants assert in their motion that Plaintiff insinuated the existence of a conspiracy at his deposition (ECF No. 45, PageID.427-429), but neither this Court in its September 3, 2021 order, nor the Undersigned, has interpreted Plaintiff's complaint as stating such a claim.

Although Defendants seemingly concede that Plaintiff's grievance against Elum—JCF-2019-10-1861-17B—constitutes protected conduct as to his claims against each Defendant, including Elum (ECF No. 45, PageID.411),[3] the Court has previously ruled otherwise.  In my Report and Recommendation on Defendants' prior dispositive motions, I recommended that the Court dismiss Plaintiff's claim against Elum arising out of the transfer itself, for failure to exhaust that claim (ECF No. 27, PageID.245-246), and the Court adopted this recommendation (ECF No. 29, PageID.284-286).  In so doing, I reasoned:

> On October 4, 2019, Plaintiff initiated a grievance against Elum – JCF-2019-10-1861-17B.
>
> \* \* \*
>
> If the grievance initiated against Elum on October 4, 2019 – JCF-2019-10-1861-17B – is the protected conduct, and if the late October transfer from JCF to URF is the alleged adverse action, then the early October 2019 grievance does not operate to exhaust Plaintiff's retaliation claim against Elum.  It would only operate to exhaust Plaintiff's claims regarding the alleged October 4, 2019 events in the law library involving Defendant Elum (ECF No. 1, ¶¶ 6-9, 11-15), which encounter did not constitute protected conduct.

(ECF No. 27, PageID.260-261.)

Likewise, that October 4, 2019 grievance, filed later in the day, cannot serve as the protected conduct for Elum's alleged retaliatory threat of transfer made earlier that same day.  Thus, at least with regard to Plaintiff's remaining claim

---

[3] Defendants mistakenly state, "Johnson's assertion that he filed a grievance against Elum may form a basis for protected conduct as to his claims against Elum."  (ECF No. 45, PageID.411.)

against Elum, the Court need only consider, as it did in the prior round of

dispositive motions, whether Plaintiff's alleged assistance with prisoner

Chambers's appellate application constitutes protected conduct.

     As summarized in my Report and Recommendation, in the earlier motions to

dismiss, Defendants asserted that MDOC PD 05.03.116 prohibited Plaintiff from

providing prisoner Chambers legal assistance and, thus, such assistance could not

constitute protected conduct, because Plaintiff was not the legal writer assigned to

prisoner Chambers.  (ECF No. 27, PageID.256-257 (citing ECF No. 8,

PageID.87).)  Also relying upon MDOC PD 05.03.116, Plaintiff argued that he was

justified in assisting prisoner Chambers because the policy states that "facilities

shall not prohibit prisoners without counsel from requesting legal assistance from

other prisoners in legal matters" and "**shall not prohibit** prisoners within the same

facility who may have the skills or ability to assist with litigation, **nor shall any**

**reprisals be made against a prisoner who assist[s] other prisoners with legal**

**matters**."  (ECF No. 14, PageID.168 (emphases in original); *see also* ECF No. 27,

PageID.257 and citations therein.)  Indeed, the Sixth Circuit has instructed that

"[h]elp[ing] other prisoners with their legal claims . . . is protected . . . when the

inmate receiving the assistance would otherwise be unable to pursue legal redress."

*Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2013).

     Ultimately, this Court held:

> [H]ere, Johnson plausibly alleges that Chambers needed his assistance
> in order to meet a filing deadline in the Michigan Court of Appeals.
> Defendants have not yet fully explained to the Court's satisfaction
> how, under these circumstances, the MDOC policy on which they rely
> can be reconciled with the rule adopted by the Sixth Circuit.  At the
> summary judgment stage, Defendants may re-raise their argument that
> Johnson's assistance to Chambers did not amount to protected
> conduct.

(ECF No. 29, PageID.287-288.)

Defendants have re-raised this argument in the instant motion, but have

failed, in my estimation, to sufficiently reconcile their assertions under MDOC PD

05.03.116 with the Sixth Circuit precedent quoted above.  Defendants regurgitate

the argument that under MDOC PD 05.03.116, only prisoners who complete legal

writer training may provide legal assistance to other prisoners.  (ECF No. 45,

PageID.413-415.)  But they make no effort in the brief to reconcile that policy with

the rule adopted by the Sixth Circuit in *Herron*, as suggested by this Court.  (*See*

ECF No. 29, PageID.287-288.)

In their reply brief, Defendants do acknowledge Plaintiff's citation to the

portion of MDOC PD 05.03.116 which states that facilities shall not prohibit

prisoners from requesting legal assistance from other prisoners with the requisite

ability, asserting:

> Johnson provided more than mere "assistance"; Johnson re-typed
> Chambers' application for leave to appeal even though he was not a
> certified legal writer with the MDOC.  (*See* Compl., ECF No. 1,
> PageID.13-14, Def.s' Mot. for Summ. J., Ex. C, Johnson Dep. Tr., pp.
> 18:25, 19:1-11, 24:18-20, ECF No. 45-4, PageID.444-474.)  Prisoner

13

> Chambers' recourse if he was unhappy with the typing quality of his pleadings was to address the matter with his legal writer, not a non-certified legal writer, like Johnson. (*See* Def.s' Mot. for Summ. J., Ex. D, MDOC PD 05.03.116(V), ECF No. 45-5, PageID.475-479.) Because Johnson engaged in more than mere legal "assistance" to prisoner Chambers by re-typing his application for leave even though he was not a certified legal writer, Johnson violated MDOC policy and, in doing so, was not engaged in protected conduct.

(ECF No. 53, PageID.621-622.)  However, they provide no support, legal or otherwise, beyond MDOC PD 05-03-116(V), for their interpretation of the word "assistance," nor analyze the rule set forth in *Herron*.  And it is not the Court's responsibility to search for such authority, or better articulate Defendants' arguments.  Accordingly, the Court should find that Defendants have failed to demonstrate entitlement to summary judgment on this basis as it relates to Plaintiff's retaliation claim against Elum.

> **b.    The Court should find, however, that Defendants are entitled to qualified immunity on the basis of the alleged adverse action**

Again, Plaintiff's remaining claim against Elum is for retaliatory *threat* of transfer.  (ECF No. 29, PageID.290.)  With regard to Parsons and Howard, Plaintiff alleges that each willfully participated in his retaliatory transfer on behalf of Elum. (ECF No. 1, PageID.12-14, ¶¶ 23, 33-34.)  Defendants assert that they are entitled to qualified immunity from these claims.  (ECF No. 45, PageID.429-431.)  For the reasons that follow, I agree.

Not every adverse action is constitutionally cognizable.  *Thaddeus-X*, 175 F.3d at 396.  *See also Ingraham v. Wright*, 430 U.S. 651, 674 (1997) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned.").  The Sixth Circuit has "adopt[ed] the standard . . . that an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake."  *Thaddeus-X*, 175 F.3d at 396.  That said, "'prisoners are expected to endure more than the average citizen,' *Siggers-El* [*v. Barlow*], 412 F.3d [693,] 701 [(6th Cir. 2005)], and so not every objectionable act directed at a prisoner constitutes adverse action sufficient to deter a person of ordinary firmness from engaging in protected activities.'"  *Reynolds-Bey v. Harris*, 428 F. App'x 493, 503 (6th Cir. 2011).

The threat of a transfer may "constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct."  *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (citing *Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009)).  And "[a]lthough several unpublished Sixth Circuit cases have held that transfers to the general population of another prison are not typically an adverse action, *see Smith v. Yarrow*, 78 Fed.Appx. 529, 543 (6th Cir. 2003) (collecting cases), this court has held in other cases that a prison transfer or the threat of a transfer can be an adverse action if that

15

transfer would result in foreseeable, negative consequences to the particular prisoner." *Hill*, 630 F.3d at 474-75 (citing *Siggers-El*, 412 F.3d at 701-02).

Plaintiff asserts that as a result of the transfer, he lost his high-paying prison job, stopped participation in the Chance for Life program, which was "beneficial" for "parole board purposes," and suffered psychological effects. (ECF No. 47, PageID.528-531; ECF No. 57, PageID.639-640.) Defendants assert that any adverse consequences Plaintiff suffered as a result of his transfer were *de minimis*, citing his deposition testimony that although he lost his job and stopped participation in the Chance for Life program as a result of his transfer, he resumed both eventually following his return to JCF on November 14, 2019 (*see* ECF No. 45-4, PageID.459), and that the two-week transfer did not cause him to miss any medical appointments or family visits. (ECF No. 45, PageID.416-421 (citing ECF No. 47, PageID.528-533).)

### i. Elum's authority and lack of involvement in transfer

Keeping in mind the fact that Plaintiff's claims involve both the threat of transfer and the transfer itself, the Court should first find that, even viewing these facts in a light most favorable to Plaintiff, Elum's alleged threat of transfer would not deter a person of ordinary firmness from engaging in protected conduct because such a threat from a librarian, who is not involved in prisoner transfers, would not foreseeably result in the negative consequences asserted by Plaintiff. In

16

her affidavit, Elum provides her MDOC job description, and states, "Thus, as a librarian, I have <u>no</u> involvement in prisoner transfers and had <u>no</u> personal involvement in Johnson's transfer from JCF to URF." (ECF No. 45-6, PageID.481-482 (emphases in original).)  And at his deposition, Plaintiff does not appear to dispute that a librarian alone does not have the power to initiate a transfer.  (*See* ECF No. 47, PageID.552-533.)  Moreover, both Howard and Parsons attest that they did not discuss Plaintiff's transfer with Elum, and Plaintiff offers no evidence to the contrary.  (ECF No. 45-2, PageID.436-437; ECF No. 59, PageID.651.)

### ii.    Adverse action

Further, the Court should conclude that, again viewing the facts in the light most favorable to Plaintiff, he has failed to show that he had a clearly established right not to be transferred (or face a threat of transfer), under these factual circumstances, and Defendants are entitled to qualified immunity from his claims. Consideration of whether a transfer constitutes an adverse action is fact specific. In *Pasley*, for example, the Sixth Circuit held that the defendant's threats to have the prisoner plaintiff "moved out of the unit so that he would lose his job and . . . to use her influence with a warden to have him moved to a location where his family would not be able to visit him" could constitute adverse action.  *Pasley*, 345 F.

17

App'x at 985.  And in *Siggers-El*, the Sixth Circuit held that a reasonable trier of fact could find retaliatory transfer where

> the Defendant was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts.  As a result of the transfer, the Plaintiff not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her.

*Siggers-El*, 412 F.3d at 701-02.

As Defendants assert, Plaintiff testified at his deposition that he ultimately had no issues receiving medical care or visiting with family as a result of his transfer.  (ECF No. 47, PageID.532-533.)  And the asserted psychological damage he suffered as a result of the transfer is insufficient to demonstrate adverse action. *See Smith*, 78 F. App'x at 543 (a transfer to the general population of another prison is not generally considered an adverse action).

Additionally, a review of Plaintiff's deposition transcript confirms Defendants' assertions that Plaintiff testified he did regain his job and place in the Chance for Life program within one or two months upon return to JCF, following a short transfer.  (ECF No. 47, PageID.528-533.)  And although he testified that he worked as a porter to save money to hire a private investigator for his criminal case, and that the Chance for Life Program would be beneficial for parole purposes, Plaintiff does not point the Court to any testimony that either actually affected his access to the courts, or his ability to win parole.

Regardless, the case law involving somewhat similar circumstances appears mixed.  In *McKinney v. Rutenbar*, No. 2:14-cv-220, 2016 WL 4157156, at *3-4 (W.D. Mich. July 11, 2016), *report and recommendation adopted*, No. 2:14-cv-220, 2016 WL 4144253, the Court, citing *Hill*, *Pasley*, and *Siggers-El* reasoned:

> In the opinion of the undersigned, threatened retaliation can constitute adverse action under some circumstances.  In this case, Plaintiff alleges that he was threatened with a transfer to a new prison and loss of his prison job.  Plaintiff has not alleged that the threat of job loss and prison transfer denied him access to the courts, the ability to pay his attorney, or would place him in a more restrictive prison environment.  Plaintiff has not shown that it is clearly established "beyond debate" that the threat of a transfer and job loss are adverse conduct under existing precedent. . . .  Accordingly, in the opinion of the undersigned, Plaintiff has failed to show that the threatened retaliation was a violation of clearly established law.

Contrastingly, in *Sims v. Rewerts*, No. 07-12646, 2009 WL 3617727, at *10 (E.D. Mich. Oct. 29, 2009) (Cohn, J), *adopting report and recommendation* by Morgan, M.J., the Court upheld the Magistrate Judge's recommendation, which stated:

> Viewing the evidence in a light most favorable to plaintiff, as the court must, a genuine issue of material fact exists as to whether plaintiff's transfer was an adverse action.  As a consequence of his transfer, plaintiff was removed from AOP, which he needed to complete to be eligible for parole and he also lost his prison job.  Such aggravating factors are not clearly inconsequential and a reasonable trier of fact could conclude that such a retaliatory act would deter a person from exercising his rights.

As Plaintiff fails to provide any definitive Sixth Circuit case law that a transfer resulting in the temporary loss of a job and participation in the Chance for Life or other similar program is sufficient to constitute adverse action, and the opinions

interpreting the existing Sixth Circuit case law appear to conflict, the Court should find that Defendants are entitled to qualified immunity from Plaintiff's retaliation claims against them because they have not violated a "clearly established" right. *See Waeschle*, 576 F.3d at 544.

### c.    Causal connection

The third element of a retaliation claim is a causal connection—"that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X*, 175 F.3d at 394.

> This element addresses whether the defendants' subjective motivation for taking the adverse action was at least in part to retaliate against the prisoner for engaging in protected conduct. *Thaddeus-X*, 175 F.3d at 399. If the prisoner can show that the defendants' adverse action was at least partially motivated by the prisoner's protected conduct, then the burden shifts to the defendants to show that they would have taken the same action even absent such protected conduct. *Id*. at 399.

*Hill*, 630 F.3d at 475.

If the Court disagrees with the above assessment regarding adverse action, the Court should find that Defendant Parsons is still entitled to summary judgment because Plaintiff failed to establish a genuine issue of material fact with regard to a causal connection between his alleged protected conduct and her participation in his transfer; but in that scenario the retaliation claim against Howard should proceed. As provided above, Plaintiff claims that Defendants Parsons and Howard willfully participated in his retaliatory transfer on behalf of Elum because he

assisted another prisoner with legal work and filed a grievance against Elum. (ECF No. 1, PageID.7, ¶ 1; ECF No. 1, PageID.13-14, ¶¶ 33-34.)  In so doing, he alleges: "On October 24, 2019, a Security Classification Screen review was prepared by C-D Housing Unit ARUS, Defendant Parsons for purposes of a transfer.  The transfer was approved by Deputy Warden, Defendant Howard[.]" (ECF No. 1, PageID.12, ¶ 23.)

### i.   Looking only to Howard's affidavit, the Court should find a material factual question with regarding causation with respect to Howard

In support of their argument that Howard acted without retaliatory motive, Defendants have attached to their motion Howard's affidavit.  Howard attests that Plaintiff was transferred from JCF to URF to accommodate incoming prisoner Northington's medical appointments, and that he had no discussions with Elum regarding the transfer.  (ECF No. 45-2, PageID.436-437.)  Further, he asserts that his only personal involvement in the transfer was signing the transfer request, "which was routine and part of [his] job responsibilities[,]" and states, "I had no personal knowledge of Johnson filing a grievance against Defendant Elum on or about October 4, 2019."  (ECF No. 45-2, PageID.437, ¶¶ 7, 8.)  The evidence, however, directly contradicts this second statement.  A review of Plaintiff's grievance against Elum—JCF-2019-10-1861-17B—reveals that Howard did in fact review Kisor's response to that grievance.  (ECF No. 8-3, PageID.140-141.)

21

Although additional evidence linking Plaintiff's protected activity to Howard's role in Plaintiff's transfer is sparse, as will be discussed more fully below, the Undersigned simply cannot ignore this blatantly incorrect statement, and recommends that – in the event the Court disagrees with my above conclusions as to adverse action and goes on to scrutinize the causation element – the Court find a genuine issue of material fact regarding causation with respect to Howard on this basis.

> ### ii. In contrast, the Court should find no genuine issue of material fact that Parsons acted with retaliatory motive

In Parsons's amended declaration, she confirms that Plaintiff was transferred to accommodate prisoner Northington, and states that her only personal involvement was completing the security classification review, which is required for transfer.  (ECF No. 59, PageID.650.)  Further, she denies knowledge of Plaintiff's October 4, 2019 grievance against Elum, and states: "I had no discussions with either Defendants Elum or Howard about transferring Johnson, nor did I conspire with anyone to have Johnson transferred from JCF to URF.  I did not retaliate against Johnson at any time for any of his alleged actions."  (ECF No. 59, PageID.651, ¶¶ 7, 6.)  Unlike Howard, there is no obvious evidence that Parsons had knowledge of Plaintiff's grievance against Elum.

Additionally, Defendants cite to Plaintiff's deposition testimony in which he struggles to articulate the specific protected conduct of which Parsons was aware or to which she responded.  (ECF No. 45, PageID.424 (citing ECF No. 47, PageID.538-540).)  Indeed, Plaintiff testified that Parsons and Howard helped Elum perfect his transfer, and that without their actions, the transfer could not have occurred.  (ECF No. 47, PageID.538-549.)  But he does not direct the Court to any testimony regarding any actual connection between Parsons's actions and his protected conduct—the assistance provided to prisoner Chambers or his grievance against Elum—or to any specific retaliatory motive.  (ECF No. 47, PageID.538-549.)

In response, Plaintiff produces email exchanges regarding his transfer, in which prison officials, including Parsons, question Plaintiff's transfer to accommodate prisoner Northington's medical appointment because of Plaintiff's own upcoming medical appointment, but then settle on the solution of *swapping the prisoners back in time for that appointment*.  (ECF No. 52, PageID.601-608.) He asserts:

> The email exchanges between MDOC officials shows that Plaintiff's transfer was rushed.  MDOC officials knew beforehand that Plaintiff had a medical offsite appointment for "cervical injection" at Henry Ford Hospital on November 18, 2019.  Instead of selecting a prisoner who did not have any medical appointments for the transfer, MDOC Defendants choose to [transfer] Plaintiff.  It was not a coincidence why MDOC Defendants selected Plaintiff as the prisoner for transfer.  The Defendants were retaliating against Plaintiff for

23

> providing legal assistance to Prisoner Chambers and for filing the
> grievance against Defendant Elum.

(ECF No. 52, PageID.587-588.)  Even viewing this evidence in a light most

favorable to Plaintiff, however, the emails only confirm Defendants' explanation

for Plaintiff's transfer, and any inference of retaliatory motive otherwise is purely

speculative.  *See Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017)

("[C]onclusory allegations, speculation, and unsubstantiated assertions are not

evidence, and are not sufficient to defeat a well-supported motion for summary

judgment.").  And notwithstanding any knowledge of a grievance possessed by

Defendant Howard, as discussed above, the record is undisputed that there was a

legitimate reason to transfer and then quickly re-transfer back Johnson – even if

seemingly inefficient – namely, to assure medical care for another prisoner

(Northington) for whom there was no cell at JCF, and then, in turn, to assure

medical care for Johnson himself.

The same is true of Plaintiff's general assertions that the temporal proximity

between Elum's alleged threats and his transfer demonstrate Parsons's retaliatory

motive.  (ECF No. 1, PageID.12-14, ¶¶ 23, 33-34; ECF No. 47, PageID.538-549;

ECF No. 52, PageID.577-578, 585; ECF No. 57, PageID.637, 640.)  While the

nature of retaliation claims often necessitates proof through circumstantial

evidence, and the timing here certainly allows for conjecture regarding motive, the

Sixth Circuit "has been reluctant to find that such evidence alone establishes

retaliatory motive." *Hill*, 630 F.3d at 476 (citing *Holzemor v. City of Memphis*, 621 F.3d 512, 525-26).  *See also Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) ("[C]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive.").  And again, Plaintiff has not directed the Court to other specific non-speculatory evidence.

Finally, Plaintiff's assertions that JCF has a history of retaliatory transfers and that two prisoners transferred to URF the same day were transferred for similar reasons (ECF No. 52, PageID.576, 583-584) do not alter the Undersigned's recommendation.  These allegations are again conclusory and unsupported by competent evidence.

### D.    Conclusion

The Court should **GRANT** Defendants' motion for summary judgment. (ECF No. 45.)  If the Court agrees, this matter is concluded.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc*. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc*. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: February 10, 2023

_____
Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE